# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANK CAPALACES,** | : | **Civil No.  3:23-CV-00034** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.    Introduction

The plaintiff in this Social Security appeal, Frank Capalaces, suffers from degenerative disc disease, causing chronic neck and back pain, along with other physical ailments, but his disability claim focuses on his psychological impairments. He has been diagnosed with bipolar disorder, often manifesting as uncontrolled anger and loud, abusive outbursts. This ultimately cost him his job as a Coca Cola salesman when he was let go on January 1st, 2009. (Tr. 66-67). He testified that he "cannot get along" in the workplace and that he often "flies off the hand" in stressful situations. (Tr. 67, 69-70). He alleges he became disabled on January 1, 2010, primarily due to these psychological limitations.

However, Capalaces' testimony regarding the severity of his psychological limitations stands in contrast to the records of his treating psychiatrist, Dr. Arun Shah, who regularly reported that Capalaces was coherent and cooperative with normal insight and judgment and stable mood, and Capalaces' own reports of spending time on his hobbies of gardening and traveling, and often interacting with family and friends.

On these facts, the ALJ who presided over Capalaces' disability hearing concluded that he had not met the stringent standard required to establish disability and denied this claim. (Tr. 12-22). While Capalaces challenges the ALJ's decision, we are reminded of the familiar proposition that we exercise a limited scope of substantive review when considering Social Security appeals. As the Supreme Court has noted:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

While we regard this as a close case, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings that the plaintiff was not disabled. We further find that the ALJ's consideration of Capalaces' emotional impairments at all stages of this sequential analysis render any alleged Step 2 error harmless. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   **Statement of Facts and of the Case**

The administrative record of Capalaces' disability application reveals the following essential facts: Capalaces applied for disability insurance benefits on July 8th, 2020, (Tr. 81), with an amended onset date of disability of January 1st, 2010.[1]

---

[1] Capalaces' application for disability benefits alleged an onset date of November 25th, 2008. (Tr. 83). At his hearing, Capalaces indicated that he was still working into 2009, so he agreed to amend his onset date to January 1st, 2010. (Tr. 66).

(Tr. 66). Capalaces was born on August 30, 1960, and was approximately 49 years old at the time of the alleged onset of his disability. (Tr. 81). He received his GED and worked as an Account Manager for retail beverage companies from 1990 until 2008, most recently for Coca Cola. (Tr. 67, 236). In his application for disability benefits, Capalaces alleged he was limited in his ability to work due to knee, shoulder, neck, back, and hip pain, high cholesterol, type 2 diabetes, dizziness, and bipolar disorder. (Tr. 235). He testified that he is primarily unable to work due to his mental condition, stating that he "cannot get along" in the workplace because he gets excited easily and has problems dealing with people due to his bipolar disorder. (Tr. 70).

Capalaces challenges only the ALJ's findings as to his psychological impairments, so our analysis of the administrative record is limited both in time and scope, focusing on Capalaces' mental health treatment records during the period between the alleged onset date, January 1, 2010, and his date last insured, December 31, 2014.[2]

---

[2] Under 20 C.F.R. § 404.131(a), a claimant must establish that he was disabled prior to his date last insured.

4

During this relevant period, Capalaces was being treated by psychiatrist Arun Shah, MD. Dr. Shah stated that he began treating Capalaces in October 2010, though psychiatric treatment notes on his letterhead are dated as early as January 2010.[3]

Dr. Shah's treatment records between 2010 and 2015 are relatively unremarkable. His examination notes at nearly every appointment between 2010 and 2015, state that Capalaces was alert and oriented to person, place, and time, denied suicidal thoughts or delusions, or hallucinations, and that he was coherent and cooperative. (Tr. 358-423). Dr. Shah also frequently described Capalaces as having fair insight and judgment, and regularly reported that he was compliant with his medications. (Id.)

Early treatment records, in April 2010, note major anger problems, but no major outbursts, though his mood was up and down and affect labile. (Tr. 388). In June 2010 he reported panic attacks and agoraphobia, and indicated he had walked out of an MRI, but also noted he was working in the yard gardening and had opened his pool. (Tr. 389). In July 2010 he reported feeling better, but still anxious with up

---

[3] The record also includes sparse psychiatric treatment notes dating back to November 2007. It is unclear, and neither party clarifies, exactly who was treating Capalaces prior to October 2010, so, for our purposes, we note only Dr. Shah as his treating psychiatrist. Given the paucity of records prior to this date, whether or not Dr. Shah was his treating physician at that time is irrelevant to our analysis.

and down mood, (Id.), and at his appointment on October 18th, 2010, he told Dr. Shah that he had gone on a three-day cruise that "was a blast." (Tr. 390). Later in October 2010, he reported "saying wrong things to wrong people" and being "angry about little things," and the plan was to continue supportive therapy and anger management techniques. (Tr. 359).

Overall, the treatment records do show periods of ups and downs expected with a bipolar diagnosis. For example, throughout the treatment records, Capalaces frequently mentions his gardening hobby, (Tr. 362, 366, 370, 380, 389), that enjoyed spending holidays with his wife's family, (Tr. 362, 363, 368, 379, 380), reported visiting friends, (Tr. 366, 390, 419), and traveling. (Tr. 369, 372, 380, 390, 404, 412, 418, 578, 579). The record does include examples of angry outbursts and arguments with neighbors and friends, but also describes long periods in which Capalaces had no outbursts. For example, on November 11th, 2010, he told Dr. Shah about a couple of anger outbursts at doctors' offices and also over the phone, (Tr. 360), on December 8th, 2010, he expressed concern about a big argument with his friend, (Tr. 363), and he reported a few angry outbursts and fights with his neighbor, (Tr. 370, 372-73, 392). However, on March 9th, 2011, he explained that his temper had been good lately, (Tr. 391), in June 2011 he indicated he was using the anger management techniques to get through his days, (Tr. 371), and despite reporting an outburst at his

neighbor the week before, told Dr. Shah on July 18th, 2011, that the frequency of his anger outbursts was down. (Tr. 372). At his appointment on August 17th, 2011, he reported no fights, (Tr. 393), and denied any arguments with his neighbors at both appointments in September of 2011, indicating they were working on resolving their issues. (Tr. 375, 376).

In February and March of 2012, his treatment notes indicate he was anxious and worked-up, feeling hopeless, helpless, and stuck with no energy or motivation, (Tr. 381-86), but at his appointment on March 23rd, 2012, Capalaces reported feeling better, (Tr. 383), and in July, August, and December of 2012 reported that he was enjoying life, and noted that his mood was stable. (Tr. 396-98). His treatment records from 2013 and 2014 again indicate ups and downs, and he told Dr. Shah in March 2013 that he still has a temper and mood swings, but that his temper was less intense and less frequent. (Tr. 399). In February 2014 he reported his temper as "fair" and in May of that year he told Dr. Shah he had ups and downs with occasional episodes. (Tr. 404-405). In November 2014 Capalaces reported feeling better and, although he said he occasionally lost his temper, it was not anything like in the past as it was less frequent, less intense, and quick to resolve. (Tr. 410).

Capalaces continued to be treated by Dr. Shah after the date last insured. His treatment records from 2015 indicate that he was stable, reported good relationships

with normal examination findings. (Tr. 412-419). In November 2015 he stated he was doing really well on his current medications but did attribute his improvement to not having the stresses that he used to when he was working. (Tr. 418). From 2016-2021, and the treatment records primarily show good, stable mood, but with a few sporadic incidents. (Tr. 565-589). For example, in August 2016 he noted getting easily irritated and fighting with people, (Tr. 567), in December 2017 he noted being frustrated, in June 2019 he admitted that he gets excited and loud, (Tr. 579), and in October 2021 he noted that he continued to have mood swings and was easily excitable, having episodes in the community once or twice a week where he gets upset, loud, and confrontational with others. (Tr. 589). However, aside from these notes, the majority of the treatment notes from 2016-2021 again note that Capalaces was coherent, cooperative, with normal speech, good relationships, and stable mood, and notes holidays spent with family, and trips to Arizona, Florida, Cleveland, and Iceland. (Tr. 570, 571, 575, 578, 579). In September 2019, he went off Lithium, (Tr. 580), and he went off Paxil and Cymbalta in June of 2020. (Tr. 584).

Based upon this clinical history, three medical sources opined regarding the disabling effect of Capalaces' psychological impairments. State agency medical consultant Shelley Harriet Ross, Ph.D. submitted an opinion regarding Capalaces' mental impairments and found that he had only a mild limitation in his ability to

understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (Id.) Dr. Ross specifically referenced the treatment records of Dr. Shah from 2010 to 2014, noting he was doing well on meds, denied major ups and downs, and mentioned a few episodes but overall indicated he was doing better with frequent, less intense, and easier to resolve episodes. (Tr. 87). Based on her review of this evidence, Dr. Ross found that Capalaces' statements about his mental impairments were partially consistent and that his mental health impairments were non-severe. (Id.)

On reconsideration, State agency medical consultant Dennis C. Gold, Ph.D. also reviewed Dr. Shah's treatment records, and opined that the previous determination was consistent and supportable, and that Capalaces' mental impairments were non-severe. (Tr. 101-102).

Capalaces' treating physician, Dr. Shah also completed a questionnaire about Capalaces' mental limitations on or before December 31, 2014. (Tr. 590-92). Dr. Shah opined that Capalaces would have extreme limitations in his ability to maintain attention and concentration, more than slight limitations in his ability to perform activities within a schedule, maintain regular attendance and/or be punctual within customary tolerances, and moderate limitations in his ability to complete a normal work day and work week without interruptions from psychological based symptoms

9

and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 590). As to Capalaces' limitations in his interaction with others, Dr. Shah noted extreme limitations in all categories, including extreme limitations in Capalaces' ability to interact appropriately with the general public, his ability to accept instructions and respond appropriately to criticism from supervisors, and his ability to get along with co-workers. (Tr. 590). Dr. Shah opined that Capalaces had a moderate limitation in his ability to respond appropriately to ordinary stressors in a work setting with simple tasks, and that his psychological impairments, combined with any side effects of medication, would cause Capalaces to be absent from work two days per month. (Tr. 591). Dr. Shah noted that Capalaces' condition had not improved since December 31, 2014, and his limitations had not gotten any better since that date. (Tr. 592).

In addition to the questionnaire, Dr. Shah was examined by Capalaces' attorney on October 15th, 2021. (Tr. 594-603). Dr. Shah testified that he opined that he would have difficulties in working with others because, although Capalaces sometimes responded appropriately to very benign situations with coworkers during a manic episode, he could be easily excitable and irritable. (Tr. 597-98). He noted that he did not remember any episode where Capalaces has been violent, but that he can be quite loud, threatening, using bad language, and making gestures. (Tr. 598-

99). In response to Capalaces' attorney's questions, Dr. Shah noted that it would be expected that he would have these episodes in a work situation from once every other week up to once or twice a week, although it was tough to predict. (Tr. 599). According to Dr. Shah's testimony, Capalaces' condition has always been up and down, but at the time he was still having episodes, although they were less frequent because he was not working. (Tr. 601). He opined that his episodes would "ratchet up" even in a low stress job. (Tr. 602).

A telephonic disability hearing was conducted on November 19th, 2021, at which Capalaces and a vocational expert testified. (Tr. 63-80). At the hearing, Capalaces testified about his symptoms, stating that he "cannot get along" in the workplace and stated, "I do a lot of things, I say a lot of things that are wrong, and it cost me my job." (Tr. 67). He testified that he flies off the handle quite a bit in certain situations, says things he should not say, and has been asked to leave places because of his outbursts. (Tr. 69). While working as a Coca Cola salesman, he testified that he would have outbursts three times per week in the workplace, was written up for his verbal altercations, and was eventually terminated after a physical conflict due to a zero-tolerance policy. (Tr. 69-70, 73). According to Capalaces, he gets easily excited and has problems dealing with people due to his bipolar disorder. (Tr. 70). He testified that the medication has helped, but that he is better off not

dealing with people in the general public. (Id.) When he is having an angry outburst, he stated that he swears and uses abusive language and loud, fast speech, and later has no recollection of what he has said. (Tr. 71-72).

A vocational expert, Salvatore Garozzo, also testified at the hearing. According to the vocational expert, an individual with Capalaces' same age, education, and past work experience who was limited to a medium exertional level, but is unable to interact with the public and only occasionally interact with supervisors and coworkers could not perform his past work, but could perform jobs that exist in the national economy, including a kitchen helper or dishwasher (148,000 jobs), floor waxer (118,000 jobs), or machine packager (89,000 jobs). (Tr. 77-78). The vocational expert did note, however, that, in general, employers have a tolerance for one to three verbal outbursts, and one physical altercation, before separation. (Tr. 79).

Following the hearing, the ALJ issued a decision denying Capalaces' application for benefits. (Tr. 12-22). In that decision, the ALJ first concluded that Capalaces met the insured requirements of the Act through December 31, 2014, and had not engaged in substantial gainful activity during the period from his alleged onset date of January 1, 2010, through his date last insured of December 31, 2014. (Tr. 17).  At Step 2 of the sequential analysis that governs Social Security cases, the

ALJ found that Capalaces had the following severe impairments: degenerative changes of the lumbar spine and degenerative disc disease of the cervical spine. (Id.) The ALJ explained that Capalaces' medically determinable mental impairments of bipolar disorder, personality disorder, and posttraumatic stress disorder (PTSD), considered singly and in combination, did not cause more than minimal limitations on his ability to perform basic work-related mental work activities through the date last insured and were therefore not "severe." (Tr. 18).

In making this finding, the ALJ considered the broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). (Id.) The ALJ explained:

> The first functional area is understanding, remembering, or applying information. In this area, the claimant had a mild limitation through the date last insured. There is no evidence from the period in question of memory deficits. In addition, the claimant indicated he is able to follow written instructions very well (Exhibit B3E, p.6). He did not need reminders for medication, nor did he need reminders regarding his personal care (Exhibit B3E, p.3).
>
> The next functional area is interacting with others. In this area, the claimant had a mild limitation through the date last insured. Records from the period in question describe a normal mood and affect (Exhibit B1F, p.16 and p.29). Records consistently describe the claimant as cooperative (Exhibit B2F). Other records describe him as coherent, relevant, and cooperative (Exhibit B2F, p.54). Records also state that the claimant spent time with his wife's family during the holidays

(Exhibit B2F, pp.5-6 and p.22). Accordingly, I find that the claimant had only a mild limitation in this area of functioning.

The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant had a mild limitation through the date last insured. Records describe good attention and concentration (Exhibit B2F, p.54). Other records describe the claimant's attention and concentration as fair-to-good (Exhibit B2F, p.46). The claimant also had normal thought processes and no abnormal thoughts (Exhibit B2F, p.46).

The fourth functional area is adapting or managing oneself. In this area, the claimant had a mild limitation through the date last insured. Records describe good insight and judgment (Exhibit B2F, p.54), as well as normal associations and no abnormal thoughts (Exhibit B2F, p.46). The claimant was able to travel when he "got bored" during winter (Exhibit B2F, p.42). This required adapting and managing himself (Exhibit B2F, p.42). On another occasion, the claimant traveled to the Dominican Republic (Exhibit B2F, p.12). While receiving treatment, the claimant was able to control his temper (Exhibit B2F, p.34). Accordingly, I find that the claimant had only a mild limitation in this area of functioning. Because the claimant's medically determinable mental impairments caused no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there was more than a minimal limitation on the claimant's ability to do basic work activities, they were not "severe" (20 CFR 404.1520a(d)(1)).

(Tr. 18). The ALJ noted that his findings were consistent with the opinions of State agency medical consultants Dr. Ross and Dr. Gold. (Id.)

At Step 3, the ALJ determined that Capalaces' did not have an impairment or combination of impairments that met or medically equaled the severity of one of the

disability listing impairments, considering the listings that most closely related to the physical impairments he categorized as "severe." (Tr. 19).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Capalaces' impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except he could climb, balance, stoop, kneel, crouch, or crawl no more than frequently.

(Id.)

Specifically, in making the RFC determination, the ALJ considered the medical evidence and Capalaces' testimony regarding his impairments. The ALJ first engaged in a two-step process to evaluate Capalaces' alleged symptoms. He found that, although the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, Capalaces' statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 20).

In making this determination, the ALJ primarily considered statements and medical records relating to Capalaces' psychological impairments, citing Capalaces'

testimony that his disability claim is primarily based on mental impairments, not physical ones. (Tr. 19). The ALJ noted that Capalaces testified that he became disabled because he got aggravated with other people and had difficulty getting along with other people. (Id.) The ALJ then analyzed Capalaces' statements against the medical records and medical opinion evidence, noting that the information in these records from the period prior to the expiration of the date last insured was inconsistent with Capalaces' allegations. (Tr. 20). Specifically, the ALJ explained that records from 2010 and 2011 indicating Capalaces spent time during the holidays with family demonstrated an ability to get along with others. (Id.) Further, according to the ALJ, the medical records noted no major anger outbursts in 2011 and reported fewer mood swings in 2013 and less intense temper. (Id.) The ALJ noted that in 2012 Capalaces was working in his garden, going to the gym, and working on chores without any anger outbursts and during 2013 he reported walking the dog, shopping, cleaning the house, and cleaning the pool. (Id.) The ALJ also mentioned that the record stated that Capalaces had no side effects from medication and was able to travel often. (Id.) The ALJ found this demonstrated a high level of both physical and mental functioning. Further, the ALJ noted that the mental health treatment records from March 8, 2013, to November 13, 2015, generally noted a positive response to medical, without side effects, as well as generally favorable mental status

examination findings, and his primary care records during the relevant period did not describe any significant problems with Capalaces' ability to interact appropriately with treatment providers or manage his anger. (Id.)

In fashioning the RFC, the ALJ also considered the medical opinions and prior administrative medical findings. The ALJ found the assessments of state agency medical consultants Dr. Ross and Dr. Gold persuasive, explaining that they have training in the requirements of the Social Security disability program and were able to review all the mental health treatment records from the period prior to the date last insured when formulating their opinions. (Id.) The ALJ also found the opinions of Dr. Ross and Dr. Gold persuasive because they both provided a narrative explanation to support their opinions, and their opinions were consistent with the content of the mental health treatment records from the period at issue. (Id.)

The ALJ found the opinions of Dr. Shah regarding Capalaces' work-related mental limitations to be unpersuasive. First, the ALJ noted that the October 5, 2021, assessment from Dr. Shah was not well supported by narrative comments and was inconsistent with the information in Dr. Shah's own treatment records from the period at issue. (Tr. 21). The ALJ went on to note that the opinions express by Dr.

Shah in a recent affidavit[4] were supported mostly by generalities about how other people with the same mental health diagnoses as the claimant might respond to certain situation. (Id.) More importantly, the ALJ noted, the opinions expressed by Dr. Shah in the affidavit were inconsistent with the content of his own treatment records showing his care of Capalaces during the relevant period. (Id.)

Having arrived at this RFC assessment, the ALJ found that Capalaces could perform his past relevant work as a driver helper, as this work did not require the performance of work-related activities precluded by his RFC. (Tr. 21). Based upon these findings, the ALJ determined that Capalaces did not meet the stringent standard for disability set by the Act and denied his claim. (Tr. 22).

This appeal followed. (Doc. 1). On appeal, Capalaces argues that the ALJ erroneously failed to find his psychiatric impairments non-severe at Step 2 or otherwise include appropriate limitations in the RFC. He also argues that the ALJ failed to consider all relevant evidence in his opinion. For the reasons set forth below, we will affirm the decision of the Commissioner.

---

[4] The ALJ describes the exhibit as an affidavit, but a review of the record demonstrates that the exhibit is a transcript of a deposition by Dr. Shah, at which Dr. Shah was only examined by the plaintiff's attorney.

## III.   **Discussion**

### A.   **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

23

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The plaintiff filed this disability application in July of 2020 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior

27

Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id</u>. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id</u>. at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

29

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

## D. **Step 2 and Harmless Error Analysis**

At step-two of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). Step 2 of this sequential analysis is often the first substantive benchmark an ALJ must address and is governed by familiar legal standards:

> With respect to this threshold showing of a severe impairment, the showing required by law has been aptly described in the following terms: "In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities. 20 C.F.R. §§ 404.1521,

416.921; S.S.R. 96–3p, 85–28. The Third Circuit Court of Appeals has held that the step two severity inquiry is a *de minimus* screening device to dispose of groundless claims.' McCrea v. Comm. of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004); Newell v. Comm. of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). 'Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.' Id." Velazquez v. Astrue, No. 07–5343, 2008 WL 4589831, *3 (E.D. Pa., Oct. 15, 2008). Thus, "[t]he claimant's burden at step two is 'not an exacting one.' McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). This step should be 'rarely utilized' to deny benefits. Id. at 361. Rather, ... [a]n individual should be denied benefits at step two only if the impairment he presents is a 'slight abnormality' that has 'no more than a minimal effect on [his] ability to work.' Id." Kinney v. Comm'r of Soc. Sec., 244 F. App'x 467, 469–70 (3d Cir. 2007). Accordingly, "[d]ue to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny." McCrea v. Commissioner of Social Sec., 370 F.3d 357, 360 (3d Cir. 2004).

Dotzel v. Astrue, No. 1:12-CV-1281, 2014 WL 1612508, at *4 (M.D. Pa. Apr. 22, 2014).

However it is also well settled that:

[E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the Commissioner for further consideration. See Nosse v. Astrue, No. 08–[CV–1173, 2009 WL 2986612, *10] (W.D. Pa. Sept. 17, 2009).

McClease v. Comm. of Soc. Sec., No. 8–CV–1673, 2009 WL 3497775, *10 (E.D. Pa. Oct. 28, 2009); see also Salles v. Comm. of Soc. Sec., 229 Fed. App'x 140, 145,

n. 2 (3d Cir. 2007) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 553 (3d Cir. 2005))

("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously

concluded that some of her impairments were non-severe, any error was harmless.").

<u>Stouchko v. Comm'r of Soc. Sec.</u>, No. 1:12-CV-1318, 2014 WL 888513, at *10

(M.D. Pa. Mar. 6, 2014).

### E. <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

We view this as a somewhat close case. However, in this setting, we are

mindful that we are not free to substitute our independent assessment of the evidence

for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's

decision is supported by substantial evidence, a quantum of proof which is less than

a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402

U.S. at 401, and "does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential

standards of review, we find that substantial evidence supported the decision by the

ALJ that Capalaces retained the residual functional capacity to perform medium

work with certain limitations. Therefore, we will affirm this decision.

The plaintiff's primary argument is that the ALJ erroneously failed to find a

severe psychiatric impairment at Step 2 of his analysis or otherwise include

appropriate limitations in the RFC. The plaintiff focuses on the *de minimus* standard at Step 2, arguing that the plaintiff clearly met this standard based on clinical treatment records demonstrating ongoing and long-standing issues with mood swings, anxiety, and anger that can result in significant outbursts. As we have explained, the Step 2 severity inquiry is *de minimus* and "[t]he claimant's burden at step two is 'not an exacting one.'" Dotzel at *4. Thus, a claim should be denied at Step 2 only if the impairments have "no more than a minimal effect on [his] ability to work." Id.

But our Step 2 inquiry does not end there. Even if we find that the ALJ erred in finding Capalaces' mental impairments not severe at Step 2, we may still find that substantial evidence supported the ALJ's opinion if the ALJ thoroughly considered the non-severe impairments at all subsequent steps in the disability analysis process. See McClease at *10, Salles at 145, n. 2 (3d Cir. 2007); Stouchko at *10.

At the outset, we find that substantial evidence supported the ALJ's Step 2 determination that Capalaces' mental impairments were not severe. As this Court has noted, "[a]n impairment significantly limits a Plaintiff's physical or mental abilities when its effect on the Plaintiff's ability to perform basic work activities is more than slight or minimal . . . . An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple

instructions, and respond appropriately to supervision, coworkers, and work pressures. Reichling v. Comm'r of Soc. Sec., No. 3:12-CV-01069, 2014 WL 3368823, at *16 (M.D. Pa. July 9, 2014) (citing 20 C.F.R. §§ 404.1545(c) and 416.945(c)). These four broad functional areas are known as the "paragraph B" criteria.

In determining that Capalaces' mental impairments were not severe, the ALJ walked through each of the paragraph B functional areas and explained his analysis. As to Capalaces' ability to understand, remember, and apply information, the ALJ found he had only a mild limitation because there was no evidence from the relevant period of memory deficits, Capalaces indicated he is able to follow written instructions very well, and he did not need reminders for medication or personal care. The ALJ found Capalaces had only a mild limitation in his ability to interact with others because records from the relevant period described a normal mood and affect, consistently described Capalaces as cooperative and coherent, and records indicate that he spent time with his wife's family during the holidays. As to his ability to concentrate, persist, or maintain pace, the ALJ found Capalaces had only a mild limitation because his medical records describe good attention and concentration, normal thought processes, and no abnormal thoughts. Finally, the ALJ found only a mild limitation in Capalaces' ability to adapt or manage himself

because the records described good insight and judgment, normal associations, no abnormal thoughts, and noted his frequent travels. The ALJ also found the record demonstrated that Capalaces was able to control his temper while he was receiving treatment.

The ALJ's determination that Capalaces had only a mild limitation in the paragraph B criteria is also supported by the opinions of the medical experts the ALJ determined deserved the greatest weight, Dr. Gold and Dr. Ross, who reviewed the medical record and found that Capalaces had only a mild limitation in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. Substantial evidence supported this assessment of the medical opinion evidence as the state agency medical consultants' opinions were supported and explained in terms of objective clinical findings and are consistent with Capalaces' treatment records showing overwhelmingly normal examination results.

We are also not persuaded by the plaintiff's somewhat confusing argument that the ALJ erroneously adopted the opinions of state agency medical consultants finding his mental impairments to be non-severe. While we agree that statements by state agency consultants about whether a claimant has a severe impairment are "inherently neither valuable nor persuasive," 416.920b(c)(3)(ii), as a finding of

severe impairment is an issue reserved specifically to the Commissioner, 20 C.F.R. §§ 404.1520b(c)(3)(ii), here, the ALJ clearly considered the entirety of each consultant's opinion, not just their conclusions on the severity of Capalaces' psychological impairments.

Further, rather than summarily adopting the opinions of the state agency consultants that Capalaces' psychological impairments were not severe, the ALJ properly considered and evaluated the broad areas of mental functioning set out in the disability regulations for evaluating mental disorders. The ALJ conducted an independent analysis of the medical records from the relevant time period and thoroughly explained his findings as to each functional area before simply noting that his findings were "also consistent with the opinions of the State agency medical consultants." (Tr. 19). Thus, the ALJ's analysis complied with the regulations.

While we acknowledge that the clinical records did include instances of angry outbursts and fights with friends and neighbors, they also consistently reported normal examination findings and long periods without any significant incidents. For example, despite the plaintiff's testimony that he would have at least three angry outbursts per week, there are often several months at a time where Dr. Shah's notes do not indicate any such occurrences. Thus, although the plaintiff argues there was sufficient evidence that Capalaces' mental impairments were severe enough to meet

the *de minimis* standard at Step 2, we are cognizant that "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009). Accordingly, since the record provided substantial support for the ALJ's finding that that Capalaces' psychological impairments were non-severe, this determination complied with the regulations and was not in error.

Moreover, even if the ALJ erred in determining that Capalaces' psychological impairments were not severe, the error was harmless because the ALJ clearly and thoroughly considered Capalaces' psychological impairments at each subsequent step in his analysis. The ALJ's analysis in fashioning the RFC clearly and thoroughly weighed Capalaces' statements about his symptoms, the mental health treatment records, and the medical opinions of Dr. Shah, Dr. Ross, and Dr. Gold. In fact, the RFC discussion focuses primarily upon Capalaces' mental impairments, since the ALJ noted that Capalaces testified that his disability claim is primarily based on mental impairments, not physical ones. Therefore, although the RFC does not include limitations based upon Capalaces' mental impairments, the ALJ clearly considered them in all stages of his analysis and substantial evidence—that is, such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion—supported the ALJ's ultimate disability determination. On these facts, therefore, any Step 2 error was harmless and does not provide grounds for remand..[5]

The plaintiff also argues that the ALJ failed to consider all relevant evidence, because the ALJ failed to exhibit or consider treatment records from Lourdes Hospital dated June 29, 2010, to February 13, 2011. We find this error was harmless because this small section of the record concerns primarily his physical health and ailments, the ALJ's determination of which he does not challenge. Social Security appeals are subject to harmless error analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

---

[5] Furthermore, at the hearing, the VE testified that there existed jobs in the national economy for an individual who could perform a full range of work at medium exertional level but is unable to interact with the public and only occasionaly interact with supervisors. (Tr. 77-78). Thus, even if the ALJ had incorporated a limitation on Capalaces' ability to interact with the public and supervisors in the RFC, he still would not have been found to be disabled.

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.'" Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

The plaintiff avers the omission of these records from Lourdes Hospital prejudiced him because it contradicts the ALJ's statement that the state agency psychologists reviewed all relevant evidence, it shows more severe physical impairments than the ALJ considered, and it contradicts the ALJ's claim that the plaintiff did not have any verbal altercations with healthcare providers. To the plaintiff's last point, he is specifically referring to a note in Capalaces pre-operative

39

history and physical on August 11th, 2010, stating that he had an argument with the physician's assistant and completed his history and physical with another doctor. (Tr. 29). We do not view this single report of an argument in 2010 to outweigh the balance of primary care records, as the ALJ noted, that do not show significant problems in his ability to interact appropriately with treatment providers. Moreover, the ALJ's mention of the primary care treatment records was brief and seemingly carried little weight in his ultimate determination as to Capalaces' mental impairments.

The plaintiff's other arguments are similarly unavailing, as the plaintiff does not challenge the ALJ's analysis of his physical impairments and, in our view, the state agency physicians reviewed all evidence that was relevant to Capalaces' mental impairments since the missing records related to his physical health.[6] Because the ultimate decision of the ALJ would not have changed with the inclusion of these records, their omission was harmless error.

While Capalaces argues on appeal that the ALJ erred in this assessment, at

---

[6] It is worth noting that, with the exception of the argument with the PA on August 11th, 2010, the only mention of Capalaces' mental health in these treatment records from Lourdes Hospital seems to reinforce the ALJ's decision, since, on December 13, 2010, a physical examination reported no overt depression, and that his past symptoms were controlled with medicines. (Tr. 33).

bottom this argument invites us to re-weigh the evidence. This we may not do. <u>See,</u> <u>e.g.</u>, <u>Rutherford</u>, 399 F.3d at 552 (quoting <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med.</u> <u>Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas,</u> <u>Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: January 8, 2024